U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 2 2 2008

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## ALEXANDRIA DIVISION

| | |
|---|---|
| **ANTHONY LAYSSARD** | **CIVIL ACTION NO. 06-0352** |
| -vs- | **JUDGE DRELL** |
| **UNITED STATES OF AMERICA** | **MAGISTRATE JUDGE KIRK** |

## R U L I N G

A one-day bench trial was held in this matter on June 5, 2008. Following the trial, we allowed the record to remain open for a limited time for the parties to submit the deposition of an unavailable trial witness, Thurman Perry; we also ordered the parties to submit additional briefs on the issues of causation and special damages. The parties have since submitted the deposition and their respective briefs. We now address the merits of the suit.

## I. FACTS AND PROCEDURAL HISTORY

This is a suit by Anthony Layssard against the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), arising out of a February 28, 2004, automobile accident. Mr. Layssard first filed an administrative claim for $300,000 against the United States Department of the Army on February 16, 2005, which was denied on May 5, 2006. Mr. Layssard filed this suit against the United States on March 6, 2006. This ruling follows a bench trial on the merits held on June 5, 2008, at which extensive evidence was presented by both sides.

This case arose from a February 28, 2004, automobile accident at Fort Polk, Louisiana. The plaintiff, Anthony Layssard, was a passenger in a 1991 Chevrolet Silverado pickup truck being driven by his employer, Thurman Perry, traveling southbound on Alabama Avenue in the left lane. At the same time, Joshua James Leath, a United States Department of the Army employee admittedly in the course and scope of his employment, was driving a Department of the Army Humvee in the right southbound lane of Alabama Avenue beside the Silverado. The United States does not dispute that it is the proper defendant, as Mr. Leath's employer.[1]

At some point Mr. Leath suddenly started moving into the left lane during an attempt to take a left turn improperly from the right lane. Mr. Perry noticed Mr. Leath's Humvee moving into his lane and started to veer to the left into an intersection, prudently braking at the same time. As Mr. Perry was nearly stopped, Mr. Leath's Humvee, traveling at low speed, scraped against the Silverado. Mr. Leath was ticketed at the time of the accident, and there is no question Mr. Leath alone was responsible for the accident. Damage to the Silverado was minimal, consisting primarily of some light crumpling and scratches over the front passenger-side wheel and scratches to the passenger door. Mr. Perry continued to drive the same truck after the accident without repairing it. The vehicles evidently did not have to be separated after the accident.[2]

---

[1] Under La. Civ. Code art. 2320, "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

[2] Although Mr. Layssard himself claimed that the vehicles were stuck together and that he needed help opening the passenger door, Mr. Perry contradicted that account. Based on the photographs of the truck and on more general credibility concerns discussed below, we find Mr. Perry's testimony more credible.

Although Mr. Layssard claims that he was hurting at the time of the accident and other people at the scene wanted to call an ambulance, it is undisputed that no ambulance or medical transport helicopter was called. In deposition, Mr. Perry did confirm that a female soldier asked Mr. Layssard if he needed an ambulance, but he heard Mr. Layssard decline and say that he was not hurt; indeed, Mr. Perry stated several times that Mr. Layssard told both the soldiers and the Military Police (MP) responding at the scene that he was not hurt.[3] Furthermore, Mr. Perry explained that after the accident, Mr. Layssard finished helping Mr. Perry unload the lawn care equipment from the truck as planned, and Mr. Layssard continued to work for Mr. Perry for three days following the accident with no complaints of pain or any restrictions on his work. Shortly thereafter, Mr. Layssard quit working for Mr. Perry.[4]

More significantly, Mr. Layssard's girlfriend, Daniella Thompson, testified that on the day of the accident, he did not mention getting hurt. Shortly after the accident, however, Mr. Layssard sought medical help for problems with his lower back and knee, and he claims that these injuries were caused or exacerbated by the accident. This was obviously not the first time he had suffered from those injuries. Prior to the accident, Mr. Layssard suffered from problems with his lower back and knee, and he walked with a limp. He had received medical treatment on February 16, 2004, less than two weeks before the accident, for a swollen and painful knee. Earlier, on October 30, 2003, Mr.

---

[3] Mr. Perry also stated that he did not see Mr. Layssard slide forward during the accident or see him hit his knee in the truck.

[4] According to Mr. Perry, Mr. Layssard quit because of a dispute over the pay schedule; according to Mr. Layssard, he quit because of his injuries. As above, we find Mr. Perry's account to be more credible.

Layssard had sought treatment for pain in his lower back and knee. Generally speaking, Mr. Layssard is suffering the same symptoms to the same degree and in the same areas of his body as before the accident.

At trial, Dr. Gerald Leglue, Mr. Layssard's treating physician and an expert in the field of physical medicine, testified that he was willing to link the plaintiff's present back and knee injuries with the accident. However, Dr. Leglue did not begin treating Mr. Layssard until after the accident, and he admitted that he based his assessment of causation on the subjective history provided by Mr. Layssard. Although Mr. Layssard informed Dr. Leglue of a history of intermittent knee pain going back to a childhood injury, Dr. Leglue stated that Mr. Layssard specifically denied having a history of back pain prior to the accident. Dr. Leglue also confirmed that Mr. Layssard had not told him of his prior treatment for back pain and knee pain in October of 2003. Thus, although Dr. Leglue was willing to link the accident to Mr. Layssard's claimed injuries, his opinion as to causation of those injuries was based on materially incomplete information provided by Mr. Layssard.

Other significant discrepancies between Mr. Layssard's testimony and the testimony of other witnesses can hardly be explained away simply as faulty memory, because the accounts are so different. However, it is Mr. Layssard's failure to inform his treating physician of a prior history of back pain—while being treated for back pain—that raises the most serious questions as to Mr. Layssard's credibility and motives for seeking treatment. Partly because of those serious credibility concerns, we find the following excerpts from the deposition of Mr. Perry to be credible:

Q:     Okay. When you were headed back to Alexandria [after the accident], at any time in the vehicle did Mr. Layssard indicate to you that he was hurting and that he wanted to go home?

A:     No, ma'am.

Q:     Did he say anything at all to you about being injured?

A:     He said to me — because prior to — prior to the accident and all that, all last year in 2003 especially the latter part of the year when he was working for me, he had a problem with his leg, his back, all up his back. And he was going to the charity hospital for it, and he couldn't — he said all they had over there was different kind of doctors and didn't know what — he said he's even seen a [unintelligible] doctor. And on the way back, he told me that "I'm going to go to Cabrini when I get back and tell them I got hurt in an accident, so they can find out what's wrong with my back." Now, that's what he said. And I told him, "Tony, you can do anything you want to do, but I'm not going to lie for you." That's the statement I made to him.

(Thurman Perry deposition, pp. 21-22).

Q:     Mr. Perry, there's been some question back and forth about on your drive back home from Fort Polk on the day of the accident, and Mr. Layssard making a statement to you that he was going to go to Cabrini and get them to find out what's wrong with his back. Do you know — why did he indicate to you that he was going to go to Cabrini as opposed to charity hospital where he was going before?

A:     He said he wasn't getting any results over there. And I remember that statement, but just how it came about, he said, "Since I was in the accident, I'm going to . . ." something to that [effect]. I don't want to misrepresent exactly what he said, because I'm not going to swear to a lie. I'm not going to — because I don't care if he gets a million dollars. I don't care if he doesn't get anything. I'm going to tell it just like I know it. And he just indicated that "I'm going to Cabrini to check on my back — to have them check on my back, so they'll get it fixed . . ." or something to the [effect].

Q:     Okay.

A:     They'll fix it.

5

Q: Okay. And did he say anything about his back being hurt in the accident and that's why he was going to Cabrini?

A: No, ma'am. He said he was going over there — as I said, I don't want to — this has been a good while ago. I don't want to misrepresent what he said. But that part I remember, because I told him, "Tony, I'm not going to lie for you."

Q: Okay. Why did you say that?

A: Because he was indicating that he was going to use the accident to have them pay for him going to Cabrini.

Q: And "them" would be the government?

A: Yes, ma'am.

(Id., pp. 47-49).

## II. RELEVANT LAW

Mr. Layssard's claims in this case are straightforward tort claims against the United States, which are analyzed under the Federal Tort Claims Act ("FTCA"). We refer to 28 U.S.C. § 1346(b)(1) ("United States as a Defendant") to determine the applicable law:

> (b)(1) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Id. (emphasis added).

Consequently, we apply the tort law of Louisiana. Louisiana courts analyze negligence claims under La. Civ. Code art. 2315, such as the one in this case, using duty-risk analysis, which the Louisiana Supreme Court has explained as follows:

> The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under LSA-C.C. art. 2315. This approach provides an analytical framework for evaluation of liability. One analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability.

Lemann v. Essen Lane Daiquiris, Inc., 923 So. 2d 627, 632-33 (La. 2006) (citations omitted).

In this case, Mr. Layssard argues that his injuries were either caused or exacerbated by the accident. Under Louisiana tort law, "[t]he defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant. It is clear that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." Lasha v. Olin Corp., 625 So. 2d 1002, 1005 (La. 1993) (citations omitted).

## III. ANALYSIS

It is important to note that Mr. Layssard's suit involves his own personal injury claims only, not any kind of property damage claim relating to the truck. If Mr. Perry had brought a claim relating to that property damage, the analysis would be different, because the United States does not dispute that its employee, Mr. Leath, caused the automobile accident. For <u>this</u> suit, the crucial question is whether Mr. Layssard's injuries were caused or exacerbated by the accident.

The evidence presented at trial leaves no doubt that Mr. Layssard suffered from essentially the same injuries prior to the accident. It is also undisputed that Mr. Layssard refused an ambulance or other medical care on the day of the accident. The rest of our findings require us to weigh credibility. Frankly, Mr. Layssard is the only person who can say for certain whether he was actually injured by the accident, but the totality of the evidence strongly suggests that his account does not conform to reality.

Mr. Layssard was the only person to testify that he was in pain following the accident. Dr. Leglue testified that the accident was the cause of his back and knee injuries, but Dr. Leglue's opinion was based on Mr. Layssard's own subjective account, which omitted his history of back pain and at least the October, 2003, treatment for back and knee pain. On the other hand, both Mr. Perry and Mr. Layssard's own girlfriend, Ms. Thompson, testified that he did not claim to be injured on the day of the accident.

More significantly, the evidence unmistakably shows that the accident occurred at a very low speed. Mr. Perry had nearly stopped the vehicle and veered away from Mr. Leath's Humvee at the time of the collision. No one knows the precise speeds involved,

but it does not require an expert to determine that when a massive Humvee collides with a pickup truck and leaves only minimal damage—light crumpling and scratches—to a small part of the vehicle, the forces involved cannot have been great. The credible accounts of the accident indicated that the vehicles did not need to be separated, and the photographs of the Silverado introduced into evidence support those accounts. It is undisputed that Mr. Perry continued to drive the Silverado pickup without repairing it after the accident. Common sense suggests that injuries, or the exacerbation of pre-existing injuries, are unlikely to occur in a low speed, minimal force collision.

The above evidence, taken as a whole, provides sufficient basis to find that the accident in question neither caused Mr. Layssard's injuries nor exacerbated pre-existing injuries. Additionally, Mr. Perry's testimony leaves the clear impression that Mr. Layssard's post-accident doctor's visits were part of an opportunistic scheme to get treatment for pre-existing injuries which were not, in fact, aggravated by the accident. We give credence to Mr. Perry's account, in light of the fact that Dr. Leglue's opinions as to causation were based in significant part on Mr. Layssard's own materially incomplete account of his medical history; the fact that Mr. Perry and Ms. Thompson, Mr. Layssard's own girlfriend, both testified that he did not mention being injured on the day of the accident[5]; and Mr. Layssard's general credibility problems stemming from these and other discrepancies.

Based on the totality of the evidence, taking the relative weight and credibility into account, we find that the accident in question neither caused nor exacerbated Mr.

---

[5] Indeed, according to Mr. Perry, at the time of the accident, Mr. Layssard affirmatively stated several times that he was not injured.

Layssard's injuries.  Because Mr. Layssard has failed to prove an essential part of the Louisiana duty-risk analysis under La. Civ. Code art. 2315, the United States is entitled to judgment in its favor.

## IV.  CONCLUSION

Based on the foregoing, we will enter a separate judgment in favor of the defendant, the United States of America.

SIGNED on this 22ⁿᴰ day of July, 2008, at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE